# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued December 6, 2004        Decided February 1, 2005

No. 02-1175

JAMES A. KAY, JR.,
APPELLANT

v.

FEDERAL COMMUNICATIONS COMMISSION,
APPELLEE

———

Consolidated with
No. 04-1045

———

Appeals of Orders of the
Federal Communications Commission

———

*Barry Richard* argued the cause for appellants. With him on the briefs were *Elliot H. Scherker*. *Robert J. Keller*, and *Aaron P. Shainis*.

*Roberta L. Cook*, Counsel, Federal Communications Commission, argued the cause for appellee. With her on the brief were *John A. Rogovin*, General Counsel, *Austin C. Schlick*, Deputy General Counsel, and *Daniel M. Armstrong*, Associate General Counsel. *Jane E. Mago*, Assistant General Counsel, entered an appearance.

Before: EDWARDS, SENTELLE, and RANDOLPH, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* RANDOLPH.

RANDOLPH, *Circuit Judge*:  These are consolidated appeals from orders of the Federal Communications Commission sanctioning James A. Kay, Jr., and Marc D. Sobel for intentionally trying to mislead the Commission, and for engaging in an unauthorized transfer of control of Sobel's land mobile service facilities. Kay and Sobel argue that the administrative record does not contain substantial evidence to support the orders.

## I.

Since the early 1980's Kay has provided two-way radio mobile service in the Los Angeles area through a sole proprietorship -- Lucky's Two-Way Radio.  He held many land mobile licenses pursuant to Part 90 of the Commission's rules, 47 C.F.R. § 90.1 *et seq.*, including 34 licenses in the 800 MHz band.  Sobel also was involved in the land mobile business in and around Los Angeles.  He too held licenses for commercial land mobile radio stations, including 15 licenses on the 800 MHz band.

In the early 1990's the Commission received information that Kay might have been evading certain regulatory restrictions by conducting business under other names.  One of the names was "Marc Sobel dba Airwave Communications."  Other information suggested additional violations.  The Commission may require licensees to submit written statements of fact bearing on the question whether their licenses should be revoked.  47 U.S.C. § 308(b).  To that end, the Commission's Wireless Telecommunications Bureau sent Kay a letter in

January 1994 requesting several categories of information, including the identity of  the stations for which Kay held licenses and the stations Kay managed.  Kay's lawyer responded with a series of demands and complaints, but supplied none of the information the Bureau sought.

In December 1994 the Commission issued an order designating issues for a hearing, including: (1) whether Kay had violated § 308(b) by failing to provide the information requested; (2) whether he had willfully violated Commission rules governing station construction and operation; (3) whether he had abused the Commission's processes by filing applications in multiple names to avoid complying with the channel sharing and recovery rules; and (4) whether, in view of the evidence adduced on those issues, Kay was fit to be a licensee.  The order identified 164 call signs subject to the hearing, eleven of which were held in Sobel's name.

About one month later, in January 1995, Kay filed a sixteen-page motion with the administrative law judge assigned to the case.  Among other things, the motion requested deletion of Sobel's call signs from the hearing designation order.  Kay's motion stated:

> James A. Kay, Jr. is an individual.  Marc Sobel is a different individual.  Kay does not do business in the name of Marc Sobel or use Sobel's name in any way.  As shown by the affidavit of Marc Sobel attached as Exhibit II hereto, Kay has no interest in any of the licenses or stations held by Marc Sobel.  Marc Sobel has no interest in any of the licenses or stations authorized to Kay or any business entity in which Kay holds an interest.  Because Kay has no interest in any license or station in common with Marc Sobel and because Sobel was not named as a party to the instant proceeding, the presiding officer should either

> change the [Order] to delete the reference to the stations identified as stations 154 through 164 . . . or should dismiss the [Order] with respect to those stations.

In a signed affidavit accompanying his motion, Kay declared under penalty of perjury that the statements in the motion were "true and correct."

Sobel's affidavit, attached to the motion, stated:

> I, Marc Sobel, am an individual, entirely separate and apart in existence and identity from James A. Kay, Jr. Mr. Kay does not do business in my name and I do not do business in his name. Mr. Kay has no interest in any radio station or license of which I am the licensee. I have no interest in any radio station or license of which Mr. Kay is the licensee. I am not an employer or employee of Mr. Kay, am not a partner with Mr. Kay in any enterprise, and am not a shareholder in any corporation in which Mr. Kay also holds an interest. I am not related to Mr. Kay in any way by birth or marriage.

The ALJ certified the matter to the Commission and the Commission deleted Sobel's licenses from the Kay proceeding. *Kay Modified HDO*, 11 F.C.C.R. 5324 (1996). Thereafter, on June 11, 1996, the Bureau sent a § 308(b) letter of inquiry to Sobel, asking him for information about his business relationship with Kay. *Sobel Order*, 17 F.C.C.R. 1872, 1873 ¶ 4 (2002). In his response, dated July 3, 1996, Sobel attached a "Radio System Management and Marketing Agreement." The Management Agreement, originally executed by Sobel and Kay in October 1994 and re-executed on December 30, 1994, set out the terms under which Kay had been managing, during the previous three years, fifteen of Sobel's stations, licensed on the 800 MHz band. (Kay had given the Bureau a copy of the same

agreement on March 24, 1995, in response to the Bureau's discovery request seeking all management agreements to which Kay was a party.)

By early 1997, Sobel had 13 license applications pending with the Commission. Rather than grant any of them, the Commission designated them, and the licenses Sobel already held, for a hearing to determine whether Sobel had transferred control of the stations named in the Agreement to Kay, in violation of § 310(d) of the Communications Act, 47 U.S.C. § 310(d). *Marc Sobel*, 12 F.C.C.R. 3298, 3300 (1997). Section 310(d) provides that no "station license, or any rights thereunder, shall be transferred . . . to any person except upon application to the Commission and upon finding by the Commission that the public interest, convenience and necessity will be served thereby." The Commission later added another issue: whether Sobel had misrepresented facts or lacked candor in the affidavit he submitted in support of Kay's January 1995 motion to remove Sobel's licenses from the Kay hearing. *Marc Sobel*, FCC 97M-82 (released May 8, 1997).

Sobel's hearing, in which Kay intervened, was the first to be completed. *See Marc Sobel*, 12 F.C.C.R. 22879 (ALJ 1997). ALJ Frysiak determined that Sobel had illegally transferred control of the stations identified in the Management Agreement. The evidence showed that Kay was managing the stations; that Kay had prepared Sobel's license applications; that Kay provided all the money and equipment to build the stations; that Kay's employees were involved in nearly all aspects of the day-to-day operation of the stations; that Kay paid all the expenses of the stations; that the revenues from operations went into Kay's bank accounts; that Sobel received none of the operating revenues; and that Kay had an option to purchase each of the stations at any time for $500 each. 12 F.C.C.R. at 22901. ALJ Frysiak also found that, in light of this evidence, Sobel's

statement in his affidavit that Kay had "no interest" in any of his radio stations or licenses was "intended to mislead and deceive the Commission with respect to Kay's actual role in the affairs of Sobel's 800 MHz stations." The evidence also showed that Sobel, in response to problems identified in his applications, provided the Commission with customer invoices for the stations listed in the Agreement. On the invoices, Kay had masked out the name and address of "Lucky's Two Way Radio"-- a name under which Kay conducts business. ALJ Frysiak found that both Sobel and Kay thought it crucial to withhold this information, which would have revealed to the Commission that Kay and Sobel were "not as independent of one another as Sobel has claimed." *Id.* at 22902, 22898-99. The ALJ concluded that all of Sobel's licenses designated for the hearing should be revoked and that his applications should be denied.

Nearly two years after the ALJ's decision in Sobel's case, ALJ Chachkin issued his decision in Kay's case. *James A. Kay, Jr.*, FCC 99D-04, 1999 WL 700534, ¶ 223 (ALJ, released Sept. 10, 1999). ALJ Chachkin accepted the ruling in the Sobel case that Kay had participated in an unauthorized transfer of control of Sobel's stations. But he found "entirely credible" Kay's and Sobel's testimony that they had not intended to deceive the Commission about their business arrangement. ALJ Chachkin also accepted as "entirely reasonable and credible" Kay's testimony that when his motion stated he had no "interest" in Sobel's "licenses or stations," he meant that he had no "ownership interest" in any "station license" held by Sobel. He discounted the findings in the Sobel hearing, believing them "tainted" because the Bureau had "deliberately concealed" from ALJ Frysiak the fact that Kay had produced the Agreement in March 1995, in response to a discovery request. *Id.* at ¶¶ 168-69, 210.

The Commission considered the Sobel and Kay cases concurrently and issued decisions in both cases on the same day. For reasons we will discuss in a moment, the Commission found that Sobel had engaged in an unauthorized transfer of control of the stations listed in the Agreement, in violation of § 310(d), that Sobel and Kay lacked candor when they denied that Kay had an interest in Sobel's stations, and that Kay violated § 308(b) when he failed to provide information the Bureau requested. One Commissioner dissented from the findings regarding lack of candor and § 308(b). As sanctions for Sobel's two violations, the Commission revoked his licenses listed in the Management Agreement, and denied all of his pending 800 MHz applications. With respect to Kay, the Commission revoked his 25 licenses in the 800 MHz band and assessed a $10,000 forfeiture for failing to comply with § 308(b). (Kay does not challenge the forfeiture.)

## II.

We will discuss first the Commission's determination that there had been an unauthorized transfer of control of Sobel's stations to Kay, in violation of § 310(d), a determination that bears heavily on the lack of candor question. Kay and Sobel argue that there is no substantial evidence that they engaged in a transfer of control because Sobel retained a proprietary interest in the stations, had unfettered access to the facilities, regularly visited the transmitter sites and gave Kay only an option to purchase the stations.

The evidence Kay and Sobel mention may point against the Commission's conclusion, but that is not the test. "Substantial evidence," in the sense used in the Administrative Procedure Act, 5 U.S.C. § 706(2)(E); *see* 47 U.S.C. § 402(e), is the amount of evidence constituting "'enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought

to be drawn . . . is one of fact for the jury.'" *Illinois Cent. R.R. v. Norfolk & W. Ry.*, 385 U.S. 57, 66 (1966), *quoting NLRB v. Columbian Enameling & Stamping Co.*, 306 U.S. 292, 300 (1939); *see Ass'n of Data Processing Orgs., Inc. v. Bd. of Governors of the Fed. Reserve Sys.*, 745 F.2d 677, 684 (D.C. Cir. 1984). Adhering to its decision in *Intermountain Microwave*, 24 Rad. Reg. (P&F) 983, 984 (1963), the Commission considered evidence bearing on six factors to determine whether Sobel had transferred control of the Management Agreement stations to Kay. On the first factor, it agreed with Sobel that he had unfettered access to the stations. On the second factor -- who controls the daily operations of the stations -- the evidence was overwhelming that Kay did. The Management Agreement provided as much: Kay's duties included "all administrative and office functions" and "all management functions." In addition, under the Agreement Kay was the "sole and exclusive supplier of all equipment and labor." The third *Intermountain* factor asks who determines and carries out policy decisions and prepares and files applications with the Commission. The evidence showed that Kay prepared Sobel's applications, set billing rates, and arranged for the acquisition of stations. The fourth factor asks who is in charge of personnel. Sobel had no employees; all of the employees at the Management Agreement stations were Kay's. The fifth factor asks who is in charge of financing. Here again the evidence showed that Kay was in charge. For instance, the Management Agreement relieved Sobel of liability for the operation and construction of the stations; Kay paid all the operating expenses; and Kay purchased all the equipment. The sixth *Intermountain* factor asks who receives profits from the operation of the stations. The Commission pointed to evidence that all revenues from operation of the stations had been deposited into Kay's account and that Sobel had received nothing in his capacity as an owner of the stations. Under the Management Agreement, revenues could be shared equally

between Kay and Sobel if the stations generated enough profit, but that had not occurred. The Commission viewed this arrangement as "in the manner of partners." *Sobel Order*, 17 F.C.C.R. 1872, 1884 ¶ 45 (2002).

In the face of this evidence, there is no doubt that a reasonable jury, instructed on the law set forth in *Intermountain*, could have reached the same conclusion as the Commission -- that Sobel had transferred control of his stations to Kay without Commission authorization. *See Allentown Mack Sales & Serv., Inc. v. NLRB*, 522 U.S. 359, 366-67 (1998).

This brings us to the Commission's finding that Kay and Sobel lacked candor with respect to their business relationship. Because effective regulation depends on the information licensees provide to the Commission, *see Leflore Broadcasting Co., v. FCC*, 636 F.2d 454, 461 (D.C. Cir. 1980), the Commission defines lack of candor to include not only providing false information but also "concealment, evasion or other failure to be fully informative accompanied by an intent to deceive." *Trinity Broad. of Fla., Inc.*, 10 F.C.C.R. 12020, 12063 (1995). While Kay and Sobel have several arguments against the Commission's lack of candor findings, their principal contention is that they did not intend to deceive and that the Commission erred in not accepting ALJ Chachkin's finding that their testimony to this effect was credible.

The law is settled that an agency is not required to adopt the credibility determinations of an administrative law judge. This much follows from § 557(b) of the APA: "On appeal from or review of the initial decision, the agency has all the powers which it would have in making the initial decision . . . ." On questions of facts, an agency reviewing an ALJ decision is not in a position analogous to a court of appeals reviewing a case tried to a district court. *See* Rule 52(a), FED. R. CIV. P. The

Supreme Court, in *Universal Camera Corp. v. NLRB*, 340 U.S. 474 (1951), rejected the idea that an agency must accept an ALJ's findings unless those findings are clearly erroneous. This is so even if the ALJ's findings rested on his evaluation of the credibility of the witnesses. *FCC v. Allentown Broad. Corp.*, 349 U.S. 363-64 (1955). Although the agency may give much weight to an ALJ's credibility determinations, the question for the reviewing court remains the same whether the agency agrees or disagrees with the ALJ -- is the agency's decision supported by substantial evidence. The rejected factual determinations of the ALJ are simply a factor for the reviewing court to consider in its substantial evidence inquiry. *See Universal Camera*, 340 U.S. at 496-97; *Swan Creek Communications, Inc. v. FCC*, 39 F.3d 1217, 1222 (D.C. Cir. 1994); *WHW Enters., Inc. v. FCC*, 735 F.2d 1132, 1141 (D.C. Cir. 1985).

Here, of course, the Commission faced conflicting findings by two ALJs who heard essentially the same testimony. Kay and Sobel stress that only ALJ Chachkin made express credibility determinations. This is true, but it does not render his findings more deserving of credit. As the Commission recognized, ALJ Frysiak's findings clearly rested on his disbelief of Kay's and Sobel's testimony. *FCC Decision (James A. Kay)*, 17 F.C.C.R. 1834, 1860 ¶ 86 (2002). Nor did the Commission err in rejecting the ALJ Chachkin's findings on the ground that the proceedings before ALJ Frysiak were somehow tainted in view of the Bureau's failure to reveal that Kay, in response to a production of documents request, had given a copy of the Management Agreement to the Bureau at the end of March 1995. ALJ Chachkin made much of this supposed "scheme" and accused the Bureau of misleading ALJ Frysiak. The Commission gave two responses, both of which were sufficient. First, Kay's production of the Agreement in March was not material. It is conceded that neither he nor Sobel supplied a copy of the Agreement with the January 1995

pleading and affidavit that stands at the center of their lack of candor. Second, the record shows that Sobel brought Kay's production to ALJ Frysiak's attention. He requested the Bureau to admit receiving the document (ALJ Frysiak denied the request as irrelevant) and he requested the ALJ to take official notice of Kay's production.

As to the rest of the evidence bearing on lack of candor, the record as a whole demonstrates ample support for the Commission's conclusions. The affidavit and the pleading were false and misleading. Kay, in the pleading, and Sobel, in his affidavit, denied that Kay had any "interest" in Sobel's licenses and stations. As the evidence relating to transfer of control shows, Kay had a very substantial interest in Sobel's stations. Kay and Sobel testified that when they used the word "interest" they meant an ownership interest and that their statements were therefore accurate because Sobel retained ownership of his licenses. But what of the stations? According to their testimony, they meant to refer only to ownership of Sobel's radio station licenses, not the stations themselves. Excerpts from July 29, 1997 Hearing Transcripts in WT Docket No. 97-56, *reprinted in* JA 532 (testimony of Marc Sobel); Excerpts from Jan. 19, 1999 Trial Transcript in WT Docket No. 94-147, *reprinted in* JA 1043 (testimony of James Kay). The Commission was entitled to reject that testimony. At the least, the Commission could find that the statements they filed were misleading and intentionally so. The sheer implausibility of their explanations; their motive to divert the Bureau's investigation, which threatened to uncover the unauthorized transfer of control; the fact that they discussed the meaning of the word "interest" before they filed the pleading and affidavit; the fact that Kay told Sobel the word meant "a direct financial stake," which describes Kay's relationship to Sobel's stations -- all this, and more, convince us that substantial evidence supported the Commission's findings of lack of candor. In other

respects the Commission found the statements filed in January 1995 misleading, but it is unnecessary to discuss why we find substantial evidence to support those findings. It is enough to point out that "the Commission must rely heavily on the completeness and accuracy of the submissions made to it, and its applicants in turn have an affirmative duty to inform the Commission of the facts it needs in order to fulfill its statutory mandate." *RKO Gen., Inc. v. FCC*, 670 F.2d 215, 232 (D.C. Cir. 1981). The Commission reasonably concluded that Kay and Sobel intentionally failed to perform their affirmative duty in their attempt to remove Sobel's licenses and stations from the original hearing on Kay's fitness to be a licensee.

*Affirmed.*