# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued January 18, 2018         Decided May 4, 2018

No. 16-1315

DAVID SAXE PRODUCTIONS, LLC AND VEGAS! THE SHOW, LLC AND DAVID SAXE PRODUCTIONS, LLC AND FAB FOUR LIVE, LLC,
PETITIONERS

v.

NATIONAL LABOR RELATIONS BOARD,
RESPONDENT

Consolidated with 16-1340

On Petition for Review and Cross-Application
for Enforcement of an Order of
the National Labor Relations Board

*Melissa A. Murphy-Petros* argued the cause for petitioners. With her on the briefs was *Bruno W. Katz*.

*Kellie J. Isbell*, Attorney, National Labor Relations Board, argued the cause for respondent. On the brief were *Richard F. Griffin, Jr.*, General Counsel, *John H. Ferguson*, Associate General Counsel, *Linda Dreeben*, Deputy Associate General

Counsel, *Julie B. Broido*, Supervisory Attorney, and *Kyle A. deCant*, Attorney.

Before: HENDERSON, ROGERS, and KAVANAUGH, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* ROGERS.

ROGERS, *Circuit Judge*: The National Labor Relations Board found that three companies (hereinafter, "the Company") producing shows in Las Vegas, Nevada violated Section 8(a)(1) of the National Labor Relations Act. The Company petitions for partial review. Because the Board seeks a remand of certain of its findings and the Company does not challenge others, what remains for the court to decide is whether the Board's finding that a dancer was discharged for engaging in protected concerted activity is supported by substantial evidence in the record considered as a whole. On the current record, the answer to that question is not straightforward.

Applying *Wright Line*, 251 NLRB 1083 (1980), the Board found the decision to discharge the dancer was motivated by her protected concerted activity but divided on the question whether the Company had met its burden to show, by a preponderance of evidence, the same action would have been taken even in the absence of her protected activity. A majority of the Board found pretext but functionally rejected a key credibility finding by the administrative law judge ("ALJ") without acknowledging that it was doing so. How the Board reconciled its conclusion on pretext and the credibility finding is unclear. The Board also appears not to account for evidence detracting from its finding of pretext. Both circumstances render unclear whether the Board adequately responded to the analysis by the dissenting Member. Accordingly, we remand

for clarification by the Board of its treatment of the ALJ's credibility finding and the Company's evidence that the contract decisions were non-pretextual. Otherwise, we deny the petition for review save for the issues on which the Board, without objection by the company, has requested a remand.

## I.

The National Labor Relations Act provides in Section 7 that employees shall have "the right to self-organization, to form, join, or assist labor organizations, to bargain collectively . . . , and to engage in other concerted activities." 29 U.S.C. § 157. Section 8(a)(1) of the Act provides, in turn, that it is an "unfair labor practice for an employer . . . to interfere with, restrain, or coerce employees in the exercise of [these] rights." *Id.* § 158(a)(1). Where an employer claims to have discharged an employee for reasons unrelated to the employee's protected activity, the Board applies the two-part test of *Wright Line* to determine whether the discharge was an unfair labor practice. *See NLRB v. Transp. Mgmt. Corp.*, 462 U.S. 393, 400–04 (1983). First, "the General Counsel [of the Board] is required to 'make a *prima facie* showing sufficient to support the inference that protected conduct was a 'motivating factor' in the employer's decision' to take adverse action." *Chevron Mining, Inc. v. NLRB*, 684 F.3d 1318, 1327 (D.C. Cir. 2012) (quoting *Wright Line*, 251 NLRB at 1089). If that case is made, then, second, "[t]he burden . . . shifts to the employer to show, by a preponderance of the evidence, that it would have taken the same action even if the employees had not engaged in protected activity." *Id.* (citing *Wright Line*, 251 NLRB at 1089). This second prong of the *Wright Line* test is at issue here. *David Saxe Prods., LLC, et al.*, 364 NLRB No. 100, at *6 (2016) ("Dec."); *id.* at *10 (Miscimarra, M., dissenting in part).

In May 2010, Carter signed a six-month contract to dance in *Vegas! The Show*, which was produced by David Saxe, owner of David Saxe Productions, LLC. He continued her contract twice. Also, in spring 2011, Carter began dancing part-time in the *BeatleShow*, produced by Fab Four Live, LLC, co-owned by Saxe and Mitch McCoy; she did not have an employment contract for this show. In December 2011, Carter was informed her employment for both shows would not be continued.

The evidence at the hearing before an ALJ showed that after the first few months of observing Carter in *Vegas! The Show*, the choreographer, Tiger Martina, was dissatisfied with the lack of versatility in Carter's performance because the show required dancers to portray different dancing and acting styles, and he asked the dance captains to work with her. Those efforts were unsuccessful. When Carter's initial contract neared completion in December 2010, Martina recommended to Saxe that Carter's contract not be renewed: Carter's dance performance was too wooden for the show and her behavior backstage, including criticizing other dancers' performance, upset other cast members. Saxe nonetheless renewed Carter's contract because he is "very loyal and tr[ies] to keep people" and wanted to give her another chance to improve her performance. Hr'g Tr. 499 (Oct. 18, 2012). When this contract was set to expire on April 26, 2011, Saxe extended it to January 2, 2012.

In November 2011, Martina and Saxe held auditions for new dancers for *Vegas! The Show*. Martina was "looking for a replacement for Anne Carter" and had made this clear to Saxe. Hr'g Tr. 676 (Dec. 12, 2012). Martina thought Carter's dancing "was no different from day one . . . [in that] it was still the same stiff uninterested performance," even while "the show had become much more established, we were getting a great

deal of interest, even from other cities, people were starting to write to us and . . . we were getting [applications from] some pretty great dancers." *Id.* at 677. Martina concluded Saxe "was starting to see what was happening from [Martina's] standpoint." *Id.* Nevertheless, they "decided to let the contract ride out." *Id*.

Other evidence showed that Martina was not alone in his concerns about Carter's performance and attitude. Dance captain Ryan Kelsey told Saxe and Martina that Carter would usually become defensive when she received feedback on her performance, and he told Martina that Carter's performance did not match the style required for the show. Additionally, Kelsey and dance captain Claudia Mitria were troubled by Carter's negative attitude backstage, which caused other cast members to complain. Toward the end of 2011, Kelsey shared his concerns with Saxe about Carter's negativity, which involved not only criticizing other dancers' performances but also complaining about paid leave, scheduling, and accommodations for injuries. Kelsey told Martina and Saxe that Carter's "negativity backstage was outweighing any benefit" from having her in the show. Hr'g Tr. 308 (Oct. 17, 2012). Mitria, in turn, recommended Saxe either not renew Carter's contract or place her on probation.

Meanwhile, at the *BeatleShow*, Carter was unhappy. She had been told by McCoy, one of the owners, to move a heavy prop across the stage and refused to do so, expressing safety concerns. Other dancers also expressed concern about moving the prop. Still, McCoy told Carter to move the prop. McCoy explained that Carter was also unhappy because she wanted additional shifts in the show and he limited them.

On December 13, 2011, Carter and other female dancers in *Vegas! The Show* met with Saxe to discuss pay and other

terms and working conditions, such as time off for injuries and adequate time to prepare in between shows.  Carter, apparently, spoke the most.  According to Carter, when she asked about providing increased rehearsal pay, Saxe said: "All you do is bitch, bitch, bitch.  I give you a job and all you do is bitch." Hr'g Tr. 117 (Oct. 16, 2012).  At other times, Saxe responded more positively that he understood her concern but he still did not "want all this bitching."  *Id.* at 120.

Kelsey recalled that after the December 13 meeting, he and Mitria met with Saxe to recommend the non-renewal of Carter's contract.  Saxe also conferred with Martina, and he heard complaints from dancers about Carter's attitude backstage.  On December 21, Carter and Saxe exchanged emails:  After other dancers had spoken with Saxe about renewing their contracts, Carter asked Saxe if they could discuss renewal of her contract and he responded that day that he was not renewing her contract for *Vegas! The Show* "[d]ue to [her] constant negative attitude and lackluster performance." He expressed the hope that she would respond professionally until her contract expired on January 2, 2012.  Also, after consulting with McCoy, who did not want Carter in his show because he thought that she lacked the proper appearance, Saxe informed Carter that she was no longer in the *BeatleShow*.

Several days later, Carter told Saxe that she was "completely blindsided" by his non-renewal of her contract. Hr'g. Tr. 122 (Oct. 16, 2012).  She claimed that she had never been disciplined or admonished for her supposed negative attitude at the show.  She also recalled that when she shared her surprise with Kelsey and Mitria, Kelsey said: "Unfortunately David [Saxe] flies off the handle and doesn't like it when people talk back to him."  *Id.* at 125.

Carter filed two unfair labor practice charges against the Company. The General Counsel of the Board filed a complaint alleging that the Company had violated Section 8(a)(1) of the Act, 29 U.S.C. § 158(a)(1), by discharging Carter for engaging in protected concerted activity, as well as by including contract clauses on non-disclosure and non-union jurisdiction over a show, maintaining overbroad and discriminatory work rules, prohibiting employees from engaging in protected concerted activities, and disparaging and threatening them with discharge and unspecified reprisals for engaging in those activities.

After a five-day hearing, the ALJ recommended dismissing the unfair labor practice charges relating to Carter's discharge from both shows. *David Saxe Prods., et al.*, 2013 L.R.R.M. (BNA) ¶ 139954, at 21 (N.L.R.B. Div. of Judges May 7, 2013) ("ALJ Dec."). The ALJ concluded that although the non-renewal of Carter's contract was motivated by her protected concerted activity (the first prong of the *Wright Line* test), the Company did not violate the Act because it had shown, by a preponderance of the evidence, that Saxe would have let Carter's contract expire notwithstanding her protected activity (the second prong of the *Wright Line* test). The ALJ credited Carter's testimony as to not being disciplined or counseled about her attitude, and as to Kelsey's description of Saxe's reaction when people talk back to him. The ALJ also found that Saxe's testimony was "internally inconsistent." *Id.* Saxe initially testified that he had decided to let Carter's contract expire after the December 13 meeting based on conversations with Martina, Kelsey, and Mitria, as well as dancers who indicated Carter's negative attitude upset them. When recalled, Saxe testified that he made the decision in October and was influenced by Carter's unwillingness to receive feedback and her performance, not by other dancers' concerns about her complaining. Resolving this "troubling" conflict, the ALJ reasoned that Saxe's initial testimony was

supported by testimony of Martina, Kelsey, and Mitria, all of whom the ALJ found to be credible witnesses. *Id.* at 21–22. The ALJ found, therefore, that "Saxe based his decision on [their] input," provided in part after the December 13 meeting, and that "the preponderan[ce] [of the] evidence shows that without this input, Carter would not have been terminated for her protected concerted complaints." *Id.* at 22. The ALJ noted that although another dancer had engaged in a heated exchange with Saxe at the December 13 meeting, she had not been disciplined by the company. *Id.* The ALJ also found that although Carter's discharge from the *BeatleShow* was motivated by her protected activity, the discharge stemmed from the valid non-renewal of her contract for *Vegas! The Show*. In sum, the ALJ found that the Company had shown by a preponderance of the evidence that it would have taken the same action even absent Carter's protected activity — that is, that it would not have renewed her *Vegas! The Show* contract and would have discharged her from the *BeatleShow* — as *Wright Line*'s second prong requires.

The Board, upon exceptions filed by the General Counsel and the Company, agreed with the ALJ that Saxe's decision not to renew Carter's contract was motivated by protected activity. Two Members disagreed with the ALJ's conclusion that Saxe still would have let her contract expire. "[F]or reasons not considered by the [ALJ]," they concluded "that the circumstances . . . warrant a conclusion that Saxe seized upon these concerns [about her performance and attitude] as pretext for discharging Carter for her protected activity at the December 13 meeting." Dec. at *6. They pointed to the timing of Saxe's decision, his inconsistent testimony, and his failure to explain why he had "suddenly" decided to terminate her when there was nothing new in the criticism of her dancing and backstage attitude. *Id.* One Member dissented. The dissent considered the timing of the decision not suspect because

Carter's *Vegas! The Show* contract was due to expire January 2 and the decision would reasonably be made just before that date. *Id.* at \*10 (Miscimarra, M., dissenting). Even if the decision were not finalized until December, evidence showed that her non-renewal was "under serious consideration" before the December 13 meeting as Saxe and Martina had agreed in November to let Carter's contract expire. *Id.* Also, that Carter had been given the opportunity to improve did not mean the Company "w[as] obligated to disregard Carter's shortcomings indefinitely." *Id.* The ALJ had "appropriately evaluated certain inconsistencies in Saxe's testimony" in view of Martina's testimony about "Carter's shortcomings as a dancer and her inability or unwillingness to take instruction, as well as that of several witnesses . . . that her fellow performers were fed up with the environment Carter fostered backstage." *Id.* The Company petitions for review.

## II.

The scope of the court's review of the Board's decision and order is limited. *NLRB v. City Disposal Sys. Inc.*, 465 U.S. 822, 829 (1984); *Laro Maint. Co. v. NLRB*, 56 F.3d 224, 228–29 (D.C. Cir. 1995). The court may not "displace the Board's choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it *de novo*." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951); *see DIRECTV, Inc. v. NLRB*, 837 F.3d 25, 33 (D.C. Cir. 2016). Still, the court's review is not without substance. The Board's findings of fact are conclusive only if supported by substantial evidence on the record considered as a whole. *See* 29 U.S.C. § 160(f); *Pac. Coast Supply, LLC v. NLRB*, 801 F.3d 321, 326 (D.C. Cir. 2015). Further, the court's review of "[t]he substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Universal Camera*, 340 U.S. at 488.

And judicial "deference is not warranted where the Board fails to adequately explain its reasoning, [or] where the Board leaves critical gaps in its reasoning." *DHL Express, Inc. v. NLRB*, 813 F.3d 365, 371 (D.C. Cir. 2016) (internal quotation marks and citation omitted).

The Company does not challenge the Board's finding that Saxe was motivated by Carter's protected activity when he made the decision not to renew her *Vegas! The Show* contract and discharge her from the *BeatleShow*. Instead, the Company contends that it would have made the same decisions about Carter even absent her protected activity. To resolve that issue, the ALJ had to assess the credibility of the witnesses. The Company maintains that the Board's decision and order regarding Carter must be partially vacated because the Board functionally disagreed with the ALJ's credibility finding in evaluating Saxe's testimony without acknowledging its rejection, and because the Board's finding that Saxe's explanation for his decision was pretextual is not supported by substantial evidence in the record.

In rejecting challenges to certain of the ALJ's credibility findings, the Board referred to its "established policy" not to overrule such findings "unless the clear preponderance of all the relevant evidence convinces [the Board] that they are incorrect." Dec. at *1 n.1. Indeed, the Board "should be reluctant to disturb [the ALJ's] findings unless error is clearly shown." *Universal Camera*, 340 U.S. at 494 (internal quotation marks and citation omitted). Yet, as the Company contends, the Board functionally overruled the ALJ's credibility finding on Saxe's reasons for not renewing Carter's contract. The court has no need now to consider whether to adopt a "special scrutiny" standard of review where the Board expressly overrules an ALJ's credibility finding. *See* Pet'r's Br. 33–35, 41 (citing *Slusher v. NLRB*, 432 F.3d 715, 727 (7th

Cir. 2005); *Weather Shield Mfg., Inc. v. NLRB*, 890 F.2d 52, 58 (7th Cir. 1989); *NLRB v. Stor-Rite Metal Prods., Inc.*, 856 F.2d 957, 964 (7th Cir. 1988)).

At the heart of the matter is Saxe's conflicting testimony. The ALJ resolved the conflict by explaining that "the timing of events, the contents of [his] December 21 email, and witness testimony," ALJ Dec. at 21, corroborated Saxe's initial testimony that he decided to let Carter go in December after consulting with others, *id*. at 21-22. His post-December 13 consultations with Martina and others, the ALJ reasoned, would have been unnecessary had he already made up his mind not to extend Carter's contract. *Id.* at 21. The Board never directly disputes this credibility finding. Rather, the Board concluded that "Saxe seized upon the[] concerns" about Carter's performance and attitude "as *pretext* for discharging Carter for her protected activity at the December 13 meeting." Dec. at *6 (emphasis added). It is unclear whether the Board determined that Saxe's testimony — that he decided to let Carter go after December 13 because of performance and attitude problems — was inherently incredible in view of the other circumstances on which it relied. If not, then the Board needs to explain how it could consider Saxe's explanation to be pretextual while at the same time purporting not to reject the ALJ's credibility finding.

Even accepting that the Board was relying on circumstances "not considered" by the ALJ, Dec. at *6, rather than rejecting the ALJ's credibility finding on Saxe, the Board "must take into account whatever in the record fairly detracts from its [conclusion's] weight," *Universal Camera*, 340 U.S. at 488. Yet the Board has not accounted for evidence indicating that Saxe, after renewing and extending Carter's contracts, was no longer willing to continue to do so. Instead, it relied on the timing of Saxe's decisions, the previous

continuances of Carter's contract, and Saxe's inconsistent testimony. The Company offered evidence, principally provided by Martina, whom the Board credited, *see* Dec. at *6, that Saxe had come to agree with Martina that Carter, despite being afforded opportunities, had shown no improvement in her dancing or backstage attitude while *Vegas! The Show* had progressed and received interest from many talented dancers. The Board offers no account of Martina's testimony that by November 2011, Saxe's earlier reasons for extending Carter's contract — to stick with people and to give her another chance — no longer had the same resonance, much less of evidence that the timing of Saxe's non-renewal decision on Carter's contract was consistent with the timing of decisions on other dancers' contracts. It appears not to have considered the likelihood that Saxe had reached his tipping point in terms of tolerating Carter's deficient performance and demoralizing backstage behavior. If the Board's reliance on "reasons not considered" by the ALJ, Dec. at *6, fails to account for evidence addressing Saxe's non-pretextual reasons for the non-renewal of Carter's contract, then its findings would be unsupported by substantial evidence in the record considered as a whole. *See Universal Camera*, 240 U.S. at 488. The Board's clarification of its treatment of the ALJ's credibility finding on Saxe's reasons for his decisions may not resolve whether not accounting for non-pretext evidence would warrant granting this part of the company's petition for review, and therefore requires clarification on remand.

Finally, the Board's dismissive response of the dissenting Member, "reject[ing] his position essentially for the same reasons that we reverse the [ALJ]," Dec. at *7 n.14, "leaves critical gaps in its reasoning," *DHL Express*, 813 F.3d at 371 (internal quotation marks and citation omitted). *See Fred Meyer Stores, Inc. v. NLRB*, 865 F.3d 630, 638 (D.C. Cir. 2017); *Haw. Dredging Constr. Co., Inc. v. NLRB*, 857 F.3d

877, 881–82 (D.C. Cir. 2017). Doubtless, as the Board noted, it has precedent for determining whether an employer's explanation is pretextual by looking to factors such as the timing of a discharge decision, inconsistent explanations, or lack of explanation for a termination where a situation appears unchanged. *See* Dec. at \*6 n.12, \*7 (citing *MDI Commercial Servs.*, 325 NLRB 53, 75 (1997), *enforced*, 175 F.3d 621 (8th Cir. 1999); *Diversified Bank Installations, Inc.*, 324 NLRB 457, 476 (1997); *GATX Logistics, Inc.*, 323 NLRB 328, 335 (1997), *enforced*, 160 F.3d 353 (7th Cir. 1998); *Trader Horn of N.J., Inc.*, 316 NLRB 194, 199 (1995); *Dumbauld Corp.*, 298 NLRB 842, 848 (1990)). But the dissenting Member suggested why these circumstances were unpersuasive upon considering the record evidence as a whole. Dec. at \*10 (Miscimarra, M., dissenting in part).

The Board, of course, is not required to reach the same conclusion as the ALJ. For purposes of the court's review, "[t]he 'substantial evidence' standard is not modified in any way when the Board and its examiner disagree." *Universal Camera*, 340 U.S. at 496. Rather, "[t]he rejected factual determinations of the ALJ are simply a factor for the reviewing court to consider in its substantial evidence inquiry." *Kay v. FCC*, 396 F.3d 1184, 1189 (D.C. Cir. 2005) (citing *Universal Camera*, 340 U.S. at 496–97). But before the court can resolve whether the Board's finding of pretext is supported by substantial evidence in the record considered as a whole, clarification is needed on the Board's treatment of the ALJ's credibility finding on the reasons given for the non-renewal of Carter's contract and its treatment of the company's evidence as to non-pretext, particularly in light of the dissenting Member's analysis of the evidence.

Accordingly, we grant the petition in part and remand the Section 8(a)(1) violations based on the non-renewal of Carter's

contract for *Vegas! The Show* and Carter's discharge from the *BeatleShow*. The Company does not object to a remand on these issues. Oral Arg. Tape 11:03–12, 11:51–12:02 (Jan. 18, 2018). We also grant the Board's unopposed request for a voluntary remand of its findings that the company violated Section 8(a)(1) as a result of the non-disclosure and non-union contractual clauses because it has overruled the precedent upon which it relied. Letter from Linda Dreeben, NLRB Dep. Assoc. Gen. Counsel, to Mark J. Langer, Clerk of the Court (Jan. 5, 2018) (Docket No. 1711650); *see Limnia, Inc. v. U.S. Dep't of Energy*, 857 F.3d 379, 386–87 (D.C. Cir. 2017). Additionally, we grant the Board's cross-application for summary enforcement of its unchallenged findings that the company violated Section 8(a)(1) by prohibiting and discouraging employees from engaging in protected concerted activity through threats, disparagement, and discrimination.