# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

Argued October 15, 2019      Decided December 10, 2019

No. 18-1299

WINDSOR REDDING CARE CENTER, LLC,
PETITIONER

v.

NATIONAL LABOR RELATIONS BOARD,
RESPONDENT

SERVICE EMPLOYEES INTERNATIONAL UNION LOCAL 2015, AS
SUCCESSOR TO SEIU UNITED HEALTHCARE WORKERS-WEST,
CTW, CLC,
INTERVENOR

---

Consolidated with 19-1010

---

On Petition for Review and Cross-Application
for Enforcement of an Order of
the National Labor Relations Board

---

*John J. Manier* argued the cause for petitioner. With him
on the briefs was *John B. Golper*.

*Michael R. Hickson*, Attorney, National Labor Relations
Board, argued the cause for respondent. With him on the brief

were *Peter B. Robb*, General Counsel, *David Habenstreit*, Acting Deputy Associate General Counsel, and *Elizabeth Heaney*, Supervisory Attorney.

*David A. Rosenfeld* was on the brief for intervenor Service Employees International Union Local 2015 in support of respondent.

Before: HENDERSON and ROGERS, *Circuit Judges*, and EDWARDS, *Senior Circuit Judge*.

Opinion for the Court by Circuit Judge Rogers.

ROGERS, *Circuit Judge*: The National Labor Relations Board found that Windsor Redding Care Center ("the Company") violated Sections 8(a)(1) and 8(a)(3) of the National Labor Relations Act by suspending and discharging one of its employees, Angelia Rowland. The Company petitions for review of that finding, and the Board has applied for enforcement of its Order, which includes matters not contested by the Company. The issue before the court is whether the Board's finding that the Company suspended and discharged Rowland because she engaged in protected activity is unsupported by substantial evidence on the record, which includes contrary findings of the administrative law judge ("ALJ") and the evidence relied on by the dissenting Member of the Board. Although the Board is not obliged to agree with either the judge or its dissenting Member, the Board is obligated to confront evidence detracting from its conclusions, particularly where the dissenting Member has offered a non-frivolous analysis. For the following reasons, we grant the Company's petition and deny the Board's application for enforcement of its Order as it relates to Rowland.

**I.**

In view of our conclusion that the Board's decision relating to the Company's suspension and discharge of Angelia Rowland was unsupported by substantial evidence, we set forth the record evidence in some detail. First, certain evidence is undisputed. The Company is a skilled nursing home in Redding, California. Its nurse employees, among others, are unionized and represented by the Service Employees International Union United Service Workers-West ("the Union"). Rowland was a nurse employed by the Company for approximately eleven and a half years, and was well-regarded. She was also visibly involved in the Union's activities, campaigning for the Union before the election, demonstrating pro-Union signs in her car in the Company parking lot, and participating in collective bargaining as a member of the Union's bargaining committee.

Further, on May 24, 2012, Rowland accompanied "Resident B," a patient of the Company, to an off-site doctor's appointment. Rowland and Resident B were transported to the doctor's office in a van driven by Lewis Johnson, who was employed by a third-party company. Resident B was known to be a difficult patient; she regularly yells and curses at her caregivers. According to Rowland's testimony, which was corroborated by other Company employees, Resident B often says "knock it off" and "I'll beat your ass" and sometimes says those two phrases in combination. Tr. 318:20–25 (Aug. 21, 2012). The ALJ found that Resident B is "prone to frequent, sometimes near constant, outbursts of yelling, screaming, and threatening, accompanied by the use of profanity. Sometimes those outbursts also include threats of bodily harm." ALJ Dec. at 10. Rowland and the Company also agreed that Resident B often varies the sound and volume of her voice.

Second, the relevant disputed facts relate to what happened when Rowland and Resident B were entering the doctor's office and Resident B was shouting and cursing. Terra Pagnano, a doctor's office employee at the front desk when Rowland and Resident B were entering, testified that she heard — but did not see — Rowland tell Resident B in response, "If you don't knock that off, I'm going to beat your ass." Tr. 797:4–5 (Aug. 23, 2012). Two other doctor's office employees at the front desk testified that they heard the same thing. The doctor's office employees were shocked, and Pagnano called Jane Thimmesch, the Company's Director of Nursing, to report what they had heard. Thimmesch passed along that information to Anne Gilles, an administrator at the Company and Rowland's supervisor. Gilles immediately went to the doctor's office and interviewed two of the three employees who claimed to have heard Rowland threaten Resident B. She impressed upon them the gravity of their accusation and asked them to repeat their story multiple times. Gilles also spoke with Johnson, the van driver; at the time, he was preoccupied with an electronic device and was terse. Johnson testified that he told Gilles that he "didn't see anything" happen between Rowland and Resident B. Tr. 457:14–24 (Aug. 22, 2012).

Third, what happened thereafter is also largely undisputed. When Rowland returned to the Company facility, Thimmesch asked her to meet with Gilles. Rowland brought a Union representative with her to the meeting, at which Gilles informed her of the accusations against her and notified her that she would be suspended pending an investigation, pursuant to the Company's elder-abuse policies. Rowland denied yelling anything at Resident B in the doctor's office.

The following day, May 25, Gilles returned to the doctor's office and spoke with the three employees who had accused Rowland of threatening Resident B. Gilles again impressed

upon them the gravity of their accusations. In light of Resident B's known habit of speaking in different voices, Gilles also asked them if they were sure that it wasn't Resident B that they had heard make the threat. The employees confirmed their stories and provided written statements to Gilles.

Also on May 25, Rowland came to the Company facility to have Gilles officially approve her absence, as a result of her suspension. Another Company employee, Alice Martinez, accompanied Rowland. At some point during the meeting, talk turned to the Union — specifically, to the signs that Union members displayed in their vehicles, which referenced an ongoing bargaining dispute. Rowland was surprised that the conversation, which she expected to be about her suspension and the investigation, had veered into Union matters, and eventually Martinez interrupted to remind Gilles that the meeting was about Rowland's job. Martinez testified that Gilles responded: "Oh no. This is about the Union. This is all about the Union." Tr. 483:9–10 (Aug. 22, 2012).

Later on May 25, Gilles had a conference call with two human resources employees and her supervisor, Ken Cess. They collectively decided to terminate Rowland's employment. On May 29, Rowland, accompanied by a Union representative, met with Gilles and Thimmesch and was informed that her employment was being terminated. At the meeting, Rowland provided a written statement denying the allegations against her and stating that she believed the suspension and termination were motivated by her Union support and involvement. Toward the end of the meeting, Gilles asked Rowland what the van driver had been doing during the May 25 incident. Rowland replied that she had covered that in the May 25 meeting and Rowland added a handwritten note to the notice of termination objecting to Gilles's failure to interview the driver.

The day after Rowland's employment was terminated, Gilles continued her investigation into the incident by calling Johnson's dispatcher. The dispatcher told Gilles that Johnson had told her that Resident B was yelling the entire time but that he did not hear Rowland say anything. Cess also investigated the incident following the discharge; he testified his concern was that an unfair labor practice charge might result, given that the discharge occurred in the midst of the Company's bargaining efforts with the Union. He attempted to speak with Johnson and also drove to the doctor's office and interviewed two of the three employees who accused Rowland of threatening Resident B. Neither party's investigations gave them reason to second-guess the decision to fire Rowland.

## II.

Section 7 of the National Labor Relations Act guarantees employees "the right to self-organization, to form, join, or assist labor organizations, to bargain collectively . . . , and to engage in other concerted activities." 29 U.S.C. § 157. Section 8(a)(1) of the Act declares it an unfair labor practice for an employer "to interfere with, restrain, or coerce employees in the exercise" of those Section 7 rights. *Id.* § 158(a)(1). Section 8(a)(3) of the Act declares it an unfair labor practice for an employer "to encourage or discourage membership in any labor organization" "by discrimination in regard to hire or tenure of employment or any term or condition of employment." *Id.* § 158(a)(3). When an employer claims to have discharged an employee for legitimate reasons and not because she engaged in activities protected by Section 7, the Board applies the two-step inquiry of *Wright Line*. *See NLRB v. Transp. Mgmt. Corp.*, 462 U.S. 393, 400–04 (1983). At step one, the General Counsel for the Board must make out a *prima facie* case that the employee's protected activity was a motivating factor in the

employer's decision to fire her.  *See Inova Health Sys. v. NLRB*, 795 F.3d 68, 80 (D.C. Cir. 2015).  If the General Counsel carries that burden, the analysis proceeds to step two, at which "the burden of persuasion shifts to the employer 'to show that it would have taken the same action in the absence of the unlawful motive.'"  *Id.* (quoting *Bally's Park Place, Inc. v. NLRB*, 646 F.3d 929, 935 (D.C. Cir. 2011)).

In 2012, following Rowland's discharge, the Union filed an unfair labor practice charge with the Board, and the Regional Director issued a complaint alleging, among other things, that the Company had violated Section 8(a)(1) and 8(a)(3) of the Act by terminating Rowland. An ALJ held an evidentiary hearing and determined that the Company had not violated the Act.  Relying heavily on Gilles's "it's all about the Union" comment, the ALJ decided that the Board's General Counsel had satisfied his burden under *Wright Line* of making out a *prima facie* case that anti-Union animus was a motivating factor in Rowland's discharge.  The ALJ then determined that the Company had carried its burden under the second step of *Wright Line* by showing that it would have discharged Rowland notwithstanding her Union activities. In so doing, the ALJ found that the Company's "investigation reasonably concluded that [Rowland] had committed the offense of which she was accused," ALJ Dec. at 21, that the misconduct of which Rowland was accused had in fact occurred, and that that incident gave the Company good reason to fire her, in light of the company's well-established zero-tolerance policy regarding "willful abuse" of residents.  Indeed, Rowland herself acknowledged in her testimony before the ALJ that if she had made the threat of which she was accused, it would have been appropriate for the Company to terminate her employment. Tr. 392:8–12 (Aug. 22, 2012).  The ALJ further found that the Company's investigation had not been superficial and that the Company had not engaged in disparate

treatment of employees based on their involvement with the Union. The General Counsel filed objections to the ALJ's findings and a brief in support of those objections. The Company did not file any objections but did file a brief responding to the General Counsel's.

Two Members of the Board concluded that the Company had not carried its *Wright Line* step-two burden of showing that it would have fired Rowland even if she had not engaged in protected Section 7 activity. The Board majority (hereinafter "the Board") rested that conclusion on two subsidiary determinations. First, it found that comparator evidence showed that employees who had committed similar offenses had not been disciplined as harshly as Rowland. Specifically, the Board found that Nancy Antonson was similarly situated to Rowland and yet had not been disciplined following an allegation of elder abuse. Antonson was accused by a patient she was caring for of repeatedly handling her roughly, despite requests to be gentler. The Company investigated the allegation but ultimately gave her only a warning. The Board found that this more lenient treatment, in the face of an allegation of misconduct that was arguably as serious as that against Rowland, indicated that the incident with Resident B was not the Company's actual motivation for discharging Rowland. Second, the Board determined that the continuation of Cess's and Gilles's investigations after Rowland's firing indicated that the Company harbored doubts that Rowland committed the misconduct of which she was accused even as it discharged her, suggesting that the alleged misconduct was not the real reason for the discharge.

The dissenting Member would have affirmed the findings of the ALJ, "see[ing] no reason to reject the [ALJ's] thorough, painstaking analysis." *Windsor Redding Care Center, LLC*, 366 NLRB No. 127, at 9 (July 17, 2018) ("Dec.") (Emanuel,

M., dissenting in part). He responded to each of the grounds on which the Board relied for its determination that the Company would not have fired Rowland absent her Union activities. First, Antonson was not, in his opinion, an appropriate comparator because in Rowland's case, unlike in Antonson's, there were multiple neutral witnesses to the incident. Second, the Company's post-discharge investigation was, he concluded, "unremarkable" given that Rowland was a good and well-liked employee and that the Company would therefore have naturally "continue[d] to investigate in hopes of uncovering information that would exonerate her." *Id.* at 10. The post-discharge investigation was appropriate, in his view, in light of "reasonably anticipated litigation over the discharge" about which Cess had testified. *Id.*

The Company petitions for review, and the Board cross-applies for enforcement of the Order accompanying its decision.

## III.

The legal principles that the court must apply are well-settled. The court reviews the Board's decision deferentially and will overturn it "only if the Board's factual findings are not supported by substantial evidence, or the Board acted arbitrarily or otherwise erred in applying established law to the facts of the case." *Fred Meyer Stores, Inc. v. NLRB*, 865 F.3d 630, 638 (D.C. Cir. 2017) (quoting *Pirlott v. NLRB*, 522 F.3d 423, 432 (D.C. Cir. 2008)). A Board decision is arbitrary and capricious if it "entirely fail[s] to consider an important aspect of the problem" or "offer[s] an explanation for its decision that runs counter to the evidence before [it]." *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Likewise, this court has made clear that the Board may not "totally ignore[] facts in the record," *Fred Meyer*

*Stores*, 865 F.3d at 638, and must "take into account whatever in the record fairly detracts from its [conclusion's] weight," *David Saxe Productions, LLC v. NLRB*, 888 F.3d 1305, 1312 (D.C. Cir. 2018) (alteration in original) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951)).

"The findings and decision of the [ALJ] form an important part of the 'record.'" *Int'l Bhd. of Teamsters, Local No. 310 v. NLRB*, 587 F.2d 1176, 1180 (D.C. Cir. 1978). Just as the board may not "totally ignore[] facts in the record," *Fred Meyer Stores*, 865 F.3d at 638, the Board is obligated to give "attentive consideration" to the ALJ's decision, *Greater Boston Television Corp. v. FCC*, 444 F.2d 841, 853 (D.C. Cir. 1970). Although the Board is "free to substitute its judgment for the [ALJ]'s," "when it disagrees with the ALJ, [it] must make clear the basis of its disagreement." *Bally's Park Place*, 646 F.3d at 935 n.4 (first alteration in original) (quoting *Local 702, Int'l Bhd. of Elec. Workers v. NLRB*, 215 F.3d 11, 15 (D.C. Cir. 2000)).

The Board's obligation to engage with record evidence, including the ALJ's decision, is particularly acute when the opinion of a dissenting Member draws attention to such evidence. To ensure that the Board's action "was the product of reasoned decisionmaking," the court will inquire whether it "'engage[d] the arguments before it,' including those of a dissenting Member," *Hawaiian Dredging Constr. Co. v. NLRB*, 857 F.3d 877, 881–82 (D.C. Cir. 2017) (alteration in original) (first quoting *State Farm*, 463 U.S. at 52; then quoting *Del. Dep't of Nat. Res. & Envtl. Control v. EPA*, 785 F.3d 1, 11 (D.C. Cir. 2015)), so long as those arguments are not so frivolous as to be "unworthy of consideration," *Chamber of Commerce of the U.S. v. SEC*, 412 F.3d 133, 144 (D.C. Cir. 2005).

The Company contends that the Board failed to engage with record evidence that was favorable to the Company and that undercut the Board's decision, rendering that decision unsupported by substantial evidence. We agree, as follows. First, the Board failed to engage with or even acknowledge the evidence of the Company's zero-tolerance elder-abuse policy, which compelled it to fire any employee found to have committed "willful abuse" of a resident. The ALJ alluded to this policy and the seriousness with which the Company treated allegations of elder abuse, and specifically found that the Company "has successfully demonstrated that it is very serious about preventing elder abuse and reporting any suspected abuse." ALJ Dec. at 19. As the ALJ found, the Company was confronted with significant evidence from three "impartial" witnesses with "no reason to be biased or prejudiced," *id.*, "that Rowland had screamed a threat of physical violence towards Resident B," *id.* at 21. Rowland's conduct "constituted obvious elder abuse" and as such, and in light of the zero-tolerance policy, "it was incumbent upon the [Company] to take some disciplinary action against the employee who had committed the offense." *Id.* The ALJ's analysis demonstrated that the existence of the zero-tolerance policy was evidence that Rowland's willful misconduct was sufficient grounds for her discharge, as she herself acknowledged, which, in turn, supported the conclusion that the Company would have discharged Rowland absent her Union activities. The Board nevertheless failed to discuss the zero-tolerance abuse policy, the seriousness with which the Company treated allegations of willful abuse of residents, and the ALJ's analysis. Yet the Board was obligated to engage with evidence that showed that the Company's conduct was lawful, *see David Saxe Productions*, 888 F.3d at 1312, particularly given that the dissenting Member highlighted the significance of the zero-tolerance policy to the *Wright Line* inquiry, *see Hawaiian Dredging*, 857 F.3d at 881–82.

Second, the Board's conclusion regarding the significance of Gilles's and Cess's post-discharge investigations is unsupported by substantial evidence. At the hearing, Gilles testified that she continued the investigation after Rowland's discharge to double check that she had properly heard and understood Johnson's version of events. Cess explained in his testimony that the motivation for his investigation was to avoid an unfair labor practice charge for discharging Rowland after an inadequate investigation, given her high profile in the Union. The dissenting Member drew the Board majority's attention to this evidence, stating that he would have found that Cess and Gilles continued their investigations after Rowland's discharge "[o]ut of an abundance of caution." Dec. at 9 (Emanuel, M., dissenting in part). The Board, in contrast, decided that "it seems only logical that the [Company] would have waited to terminate Rowland until it completed this important investigation," and that its failure to do so "suggests that the [Company] would not have taken the same action based on her purported comments alone." *Id.* at 3. Inferring from a post-discharge investigation that the employer did not believe its stated reason for the discharge may well be reasonable when that inference is supported by other record evidence or when there is no other explanation for the post-discharge investigations, but that is not the case here. To the contrary, Gilles, Cess, and the dissenting Member all offered innocuous, lawful explanations: the investigation was continued to ensure its accuracy, to avoid later charges of an insufficient investigation, or out of an abundance of caution. In light of those explanations, the Company's thorough investigation, and the report of the three doctor's office employees, the Board's conclusion that the post-discharge investigations indicated that the Company did not believe the accusations against Rowland was unreasonable.

Finally, the Board concluded that the Company engaged in disparate treatment in terminating Rowland because Nancy Antonson was similarly situated to Rowland and had not been disciplined following an allegation of elder abuse. This conclusion is not supported by substantial evidence in the record. The ALJ concluded that the General Counsel's claim that the Company was guilty of disparate treatment was meritless. The ALJ found that "[t]here were other employees accused of similar conduct, but the [Company's] investigations disclosed that no such conduct had occurred . . . [and] where employees had actually been found to have engaged in improper conduct, that conduct was not analogous to Rowland's conduct." ALJ Dec. at 21. The Board implicitly rejected the ALJ's findings, at least as they applied to Antonson and Rowland, stating that "the Company failed to explain why it reacted differently to an arguable act of physical abuse than it did to an arguable act of verbal abuse." Dec. at 3.

To the extent the Board's disparate treatment finding rests on its view that Antonson and Rowland were accused of "similar conduct," its finding is contradicted by the record. The Company records indicate that Antonson was not as gentle with a resident as the resident preferred, and that Antonson apparently rolled her eyes at the resident in response to something that she said. The record supports the conclusion that Antonson was guilty not of "willful abuse" of a resident but only of misconduct. She was disciplined but not terminated. Rowland, on the other hand, was found guilty of willful abuse and terminated pursuant to the Company's zero-tolerance policy. So, Antonson's case was not comparable to Rowland's.

The Board's disparate treatment finding also appears to rest on the view that Rowland and Antonson were similarly situated because the Company did not believe either had

committed "willful abuse" yet responded to these doubts differently. This conclusion is undermined by the Board's unreasonable interpretation of the Company's post-discharge investigation. The Board's characterization of Rowland's conduct as "an arguable act of verbal abuse" suggests that it disagreed with the ALJ's finding that the Company believed that Rowland engaged in the misconduct of which she was accused. The Board further stated that "[w]e additionally disagree with our dissenting colleague's suggestion that the [Company] found the accusations against Antonson less credible than those against Rowland," citing the post-discharge investigation as a reason. *Id.* at 3 n.10. Yet, as explained, the Board majority's conclusion, based on the post-discharge investigation, that the Company disbelieved the accusations against Rowland is not reasonable on this record. The Board, consequently, could not rely on this reasoning to justify a finding that Antonson and Rowland were similarly situated.

The Board therefore failed to adequately explain the basis of its disagreement with the ALJ, *see Bally's Park Place*, 646 F.3d at 935 n.4, and took action against the Company without the support of substantial evidence in the record. *See State Farm*, 463 U.S. at 43.

Accordingly, we grant the Company's petition for review and deny the Board's cross-application for enforcement of the portion of its Order related to the unfair labor practice finding against the Company for its suspension and discharge of Rowland. The Board's cross-application for enforcement of the remainder of its Order is granted.